### BROWN v. BASKIN et al.
### Civil Action No. 1964.

District Court, E. D. South Carolina,
Charleston Division.
July 20, 1948.

Harold R. Boulware, of Columbia, S. C., and Edward R. Dudley, Thurgood Marshall, and Constance Baker Motley, all of New York City, for plaintiff.

Robert McC. Figg, Jr., of Charleston, S. C., Sidney S. Tison, of Bennettsville, S. C., Eugene S. Blease, of Newberry, S. C., George Warren, of Hampton, S. C., Price & Poag and James H. Price all of Greenville, S. C., and Thomas A. Babb, of Laurens, S. C., for defendants.

WARING, District Judge.

The question in this case is whether Negroes have the right to become members of the Democratic Party of the State of South Carolina and to be enrolled, take part in its organization and management, and vote in its primaries.

The action is based upon the alleged rights of the plaintiff under the Constitution of the United States and particularly under Article 1, Sections 2 and 4, and the Fourteenth, Fifteenth, and Seventeenth Amendments. The jurisdiction of the court is invoked under Title 28 U.S.C.A. § 41 (1, 11, 14), and a declaratory judgment with injunction is prayed for under Title 28 U.S.C.A. § 400. It is alleged that the plaintiff and others in like situation have been deprived of the civil rights guaranteed them under Title 8 U.S.C.A. §§ 31 and 43.

The plaintiff, David Brown, is a Negro, a native-born citizen of the United States, more than 21 years of age and a resident of Beaufort County, South Carolina, where he has resided for more than 50 years prior to August 1948. He alleges that he has paid his poll tax and is a duly and legally qualified elector under the Constitution and laws of the United States and of the State of South Carolina, and is subject to none of the disqualifications provided for voting under the Constitution and laws of the United States or of the State of South Carolina. Plaintiff further states that he is a believer in the tenets of the Democratic Party and meets the lawful requirements for enrollment in the Democratic Party and for voting in the primary conducted by the said Party. And he brings this suit as a class action, as authorized by the Federal Rules of Civil Procedure of the District Courts of the United States, Rule 23(a), 28 U.S.C.A. following section 723c, on behalf of himself and for others similarly situated. The defendant W. P. Baskin is State Chairman of the Democratic Party of South Carolina, and the various other defendants are the members of the State Executive Committee and the Chairmen of the respective County Committees throughout South Carolina (save only the County of Richland, whose officials are omitted from this suit).

The suit is brought by the plaintiff to test the legality of the action of the defendants in not permitting him and other Negroes to enroll as members of the Democratic Party in this State and to exercise their right to participate in primary elections of South Carolina, and he alleges that the defendants are exercising unlawful discrimination in refusing to allow him and others in like plight to exercise their rights

and privileges in participating in the selection of Presidential Electors, United States Senators, Congressmen, and other governmental officers.

It is unnecessary to set out here with any elaboration a description of the organization of the Democratic Party, with its conventions, executive committees, and other officials in the State of South Carolina, since all of these are more fully described and set forth in a case involving the question of the right of Negroes to vote in the Democratic Primaries, tried in this court about a year ago. In that case (Elmore v. Rice, D. C., 72 F.Supp. 516, 528) the question arose as to whether the Democratic Party in South Carolina could be restricted to white persons or whether Negroes should be allowed to vote in primaries conducted by such Party. There the plaintiff was a resident of Richland County, and the defendants were the Democratic Chairman and Committeemen in charge of the Party affairs in Richland County. This court decided in that case that

" * * * the present Democratic Party in South Carolina is acting for and on behalf of the people of South Carolina; and that the Primary held by it is the only practical place where one can express a choice in selecting federal and other officials. Racial distinctions cannot exist in the machinery that selects the officers and lawmakers of the United States; and all citizens of this State and Country are entitled to cast a free and untrammelled ballot in our elections, and if the only material and realistic elections are clothed with the name 'primary', they are equally entitled to vote there."

The Elmore case was affirmed by the Circuit Court of Appeals for the Fourth Circuit on December 30, 1947, 165 F.2d 387, and thereafter certiorari was denied, 333 U.S. 875, 68 S.Ct. 905.

On May 19, 1948, the regular convention of the Democratic Party for the State organization was held in Columbia, South Carolina. The delegates to this convention were chosen by County conventions, which had been made up of delegates from precinct or ward organizations, the manner of which is more fully described in the Elmore case. That convention adopted certain rules for the government of the Party in its organization, enrollment, management, and primary elections. It is important to quote certain parts of these rules in order to understand the issues in this cause.

"Qualifications for Club Membership

"6. Qualifications for club membership in any club of the Democratic Party of South Carolina, shall be as follows, viz.: The applicant for membership shall be twenty-one (21) years of age, or shall become so before the succeeding general election, and be a white Democrat, who subscribes to the principles of the Democratic Party of South Carolina, as declared by the State Convention. He shall be a citizen of the United States and of the State of South Carolina, and shall be able to read and write and interpret the Constitution of the State of South Carolina. No person shall belong to any club unless he has been a resident of the State of South Carolina for two (2) years, of the County for six (6) months prior to the succeeding general election, and of the club district sixty (60) days prior to the first primary following his offer to enroll. Provided, that public school teachers, and ministers of the gospel in charge of a regular organized church, shall be exempt from the provisions of this rule as to residence, if otherwise qualified."

"Qualifications for Voting

"7. All duly enrolled club members are entitled to vote in the precinct of their residence, if they take the oath required of voters in the primary; and in conformity with the Order of Judge J. Waites Waring, United States District Judge, in the case of Elmore, etc. v. Rice, et al., all qualified Negro "electors of the State of South Carolina are entitled to vote in the precinct of their residence, if they present their general election certificates and take the oath required of voters in the primary."

"General Enrollment Provisions

"11. Beginning with the year 1948, and every two years thereafter, there shall be a new general enrollment of all club members, and books of enrollment for membership in the Party shall be opened by the secretary of each club, or, by the enrollment committee as hereinafter provided, on

or before the last Tuesday in May (see Rule 60) of each general election year.

\* \* \* \* \* \*

"Each applicant for enrollment shall in person write upon the club roll his full name and immediately thereafter his age, occupation and post office address, and if in a city or town, shall write the name of the street and the number of the house in which he resides if such designations exist in said city or town. \* \* \*"

"Original Roll to be Delivered to Managers

"13. The original roll shall be delivered to the managers of the primary before the hour of opening the polls; and no person shall be allowed to vote at said primary whose name does not appear on said original roll as herein required or who is not a qualified elector. \* \* \*"

"State Committee

"18. \* \* \* The State Committee is charged with the execution and direction of the policy of the party of this State, subject to these rules, the principles declared in the platform or principles and such instruction, by resolution or otherwise, as a State convention may from time to time adopt, not inconsistent with these rules, and shall continue in office two years from the time of election or until their successors have been elected.

"\* \* \* The committee shall nominate presidential electors, and if any vacancy occur in the State ticket of electors, or of the National Executive Committee, by death, resignation or other cause, the committee shall have the power to fill the vacancy; all by majority of the whole committee."

Rule No. 35 provides for the managers to take and sign an oath, which is as follows:

"We do solemnly swear that we will conduct this primary according to the rules of the party; and will allow no person to vote whose name is not regularly enrolled in this club, or who is not a qualified Negro elector, and we will not assist any voter to prepare his ballot and will not advise any voter as to how he should vote at this primary."

"Oath to be Taken by Voters

"36. \* \* \* I do solemnly swear that I am a resident of this club district, that I am duly qualified to vote in this primary under the rules of the Democratic Party of South Carolina, and that I have not voted before in this primary, and that I am not disqualified from voting under Section 2267 of the South Carolina Code of Laws, 1942, relating to disqualifying crimes.

"I further solemnly swear that I (understand) believe in and will support the principles of the Democratic Party of South Carolina, and that I believe in and will support the social (religious) and educational separation of races.

"I further solemnly swear that I believe in the principles of States' Rights, and that I am opposed to the proposed Federal so-called F.E.P.C. law.

"I further solemnly swear that I will support the election of the nominees of this primary in the ensuing general election, and that I am not a member of any other political party."

The words shown above in parentheses were in the form of oath adopted by the convention but were later deleted from the published form of oath as hereinafter described.

"Only State Convention May Amend Rules

"49. These rules may be amended or altered at the regular May convention or any State convention called specially for that purpose. Provided notice to amend be given the state chairman at least five (5) days before the convention."

"State Committee May Make Enforcement Rules

"51. The State Committee may make any rules or regulations for the purpose of enforcing these rules not inconsistent herewith."

The State Convention adjourned and has not met since, so that the rules therein adopted, parts of which are above quoted, are now in effect.

■ At the trial of the cause, the State Chairman, Mr. W. P. Baskin, was called as a witness and was asked to explain why the two words shown in the above-referred to oath, namely, "understand" and "religious" were removed from the form of oath

as now printed. He stated that some question was raised as to their propriety and that the State Executive Committee, meeting in closed session, had authorized him to delete them from the printed form of oath. He could not explain or give any reason why they were taken out except to say that they thought they were immaterial. He could not point out any authority granting to him or the State Executive Committee the right to amend, order, or change the rules adopted by the State Convention, but did say the Committee thought these changes immaterial. An examination of the rules adopted by the State Convention convinces me that neither the Chairman nor the Committee had a right to excise these words, and that the oath as printed above is the one that is really in effect until and unless amended by the State Convention. It is unnecessary to discuss further the power to delete or change this form since I am of the opinion that the whole oath is illegal and it is hereinafter discussed.

It is alleged by the complaint in this cause that the foregoing rules are violative of the rights of this plaintiff and others similarly situated in that they create a dual system of voting. Rule 6 above quoted states that qualification for membership in the Democratic Party of South Carolina shall be limited to "a white Democrat." Rule 7 provides for two classes to vote, the difference in the classes being entirely as to race. It provides first that duly enrolled club members are entitled to vote. That of course means white persons (See Rule 6). And second, "All qualified Negro electors," provided they present general election certificates and take the oath required of voters in the primary. The oath referred to for all voters to take is set forth in Rule 36 above quoted. The purport of this rule clearly is to require an oath supporting separation, segregation and discrimination, according to race.

The complaint further shows that the plaintiff and a certain number of other Negroes did enroll on the enrollment books in Beaufort County but that thereafter, on or about July 2, 1948, through the action of certain of the defendants their names were purged or stricken from the enroll-ment books and they are not accepted as enrolled members of the Democratic Party but have been told that they may vote in the primary election on August 10 only if they produce general election certificates and take the oath set forth hereinabove.

The complaint alleges that there is an actual controversy between the parties and alleges damages in the sum of $5,000, and prays for a declaratory judgment and injunction.

A Rule to Show Cause was issued against all of the named defendants who have been served and appeared and made their return, and the matter is heard upon the pleadings and testimony taken on the issue of whether or not at this time a preliminary injunction should be issued. The question of damages or permanent injunction will have to be deferred to a later date and will not be discussed herein.

It appears from certain of the returns made to the Rule to Show Cause and from the testimony taken in this case that in certain counties of South Carolina these rules as to enrollment have not been strictly followed, but certain counties have set up modifications of their own. Questions as to the power of the State Executive Committee and as to the power of the various County Executive Committees to make changes or to obey or disobey the rules adopted by the convention are not matters which have to be passed upon or decided by this court except as they may be pertinent in showing that some of the county officials are obeying the laws of the United States rather than the rules made by the Democratic Party of South Carolina.

Separate Returns were made by C. Victor Pyle, County Chairman of the Democratic Party of Greenville County; Julian D. Wyatt, County Chairman of the Democratic Party of Pickens County; and James P. Sloan, County Chairman of the Democratic Party of Laurens County; in which they stated that these respective counties had not followed or obeyed the rules made by the State Convention and that they had opened their books of enrollment, irrespective of the classifications made by the rules, and allowed all citizens entitled to enroll to put their names upon the books, irrespec-

tive of whether they were whites or Negroes; that they had not required registration certificates, and had not and would not require the taking of the oath hereinafter referred to. In other words, these three counties showed that they had kept their books open for various periods longer than that required by the Committee or State Convention; that they had entirely discarded all improper classifications as to race and that Negroes had been allowed to enroll upon exactly the same basis as whites, and that they would continue so to do and would be allowed to vote in the primaries without any discrimination as to race. The three County Chairmen ask that they be dismissed from this cause since they had followed the law rather than the Party rules long before the commencement of this case. Plaintiff's attorneys acquiesce in these prayers, stating that they are fully satisfied that the three named counties had in every way complied with the law and were managing their election machinery in conformity with the Constitution and laws of the United States.

I fully accept the statements of the three County Chairmen and commend their frankness, fairness and courage in obeying the law of the land rather than the distorted and illegal rules of the State Party, and the three named Chairmen, to wit, C. Victor Pyle, Julian D. Wyatt, and James P. Sloan, are hereby discharged from any further connection with the cause and they are dismissed therefrom.

■ H. Klugh Purdy, the County Chairman for Jasper County, made a separate Return in which he showed that he had not opened any enrollment books at all and was not following the State Convention rules, but that Jasper County had determined to hold a primary on the regular day set, namely, August 10, in which all parties, white or Negro, and irrespective of any race or creed, would be allowed to vote provided only that they presented County registration certificates and they would not be required to furnish poll tax receipts. This would seem to comply with the requirements and the complaint in this cause excepting as to the matter of the oath required by the State Convention. The Return by Mr. Purdy did not state

what action the Jasper authorities would take in regard to the oath. Mr. Purdy was present in the court and said he did not think the oath would be administered and he himself was opposed to it but he could not definitely commit the Committee at this time. Accordingly, the motion to dismiss him will have to be refused and he will be continued as a defendant so that the requirement for the application of the oath will apply to Jasper County as well as to the others.

All of the defendants, save those above specifically noted, filed a Return which goes to the main issues in this case.

■ This Return for all the defendants, other than those specifically above referred to, is in effect a general denial, and also states that the plaintiff, David Brown, had joined with a group consisting mostly or entirely of Negroes who called themselves the Progressive Democratic Party. It did appear that he had been attempting to join the Democratic Party and with other Negroes had attended meetings of a group which was called "Progressive" for the purpose of being recognized in the Democratic Party so that they could get the right to vote in the only realistic elections that were held in this State, namely, the Democratic Party Primaries. I do not think that this affects the right of the plaintiff to apply to be enrolled or to enroll or to participate. It is not shown that the so-called Progressive Democratic Party was adverse to the Democratic Party but it appears to be a group who had not been allowed to join the regular organization and had joined together under a name for the purpose of trying to get in the Democratic Party. But even if it were construed to be a separate and adverse organization, political history is full of many specific instances of persons changing from one party to the other, and there is no reason why one should be debarred from joining an organization because he had joined some other organization for the sole reason of attempting to get in the first-named one.

The scope of this case seems to me to be quite narrow, since most of the basic issues have been permanently and clearly decided and I would suppose them to be basic le-

940

gal truths, well known not only to the legal profession but to all American citizens. The Fourteenth Amendment of the Constitution of the United States provides:

"Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Title 8, U.S.C.A.. provides:

"Section 31. Race, color, or previous condition not to affect right to vote

"All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding."

"Section 43. Civil action for deprivation of rights

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

■ It should be unnecessary to state that in this country of ours no racial distinction or discrimination can be made in an election for the chosing of presidential electors and our representatives in the National Congress. In many states primaries are held by political parties, and numerous questions have arisen as to the status of political parties and the primaries conduct-

ed by them. The leading cases on this subject are: United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368, and Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987, 151 A.L.R. 1110.

The State of South Carolina formerly had constitutional and legislative provisions governing the conduct of primaries in this State, but following the decision in Smith v. Allwright, supra, the legislature met at the call of the Governor and all statutes were repealed and later constitutional provisions cancelled so that there was no statutory creation or regulation of primaries or of political organizations conducting them. The officials of the Democratic Party of South Carolina took the position that their organization was in effect a private club and was not subject to the constitutional prohibition and regulations as to racial discrimination. This issue was raised and fully canvassed in the case of Elmore v. Rice, supra. In that case no question was raised as to whether there could be racial discrimination if the conduct of the primary was a public matter since it was thought that every body now conceded that, but the sole reliance of the officials of the Democratic Party was upon the theory that it was a private organization and not subject to the general law. In the opinions in that case there was no particular effort to lay down the general law, since it was assumed that everyone, even the officials of the State Democratic Party, were familiar with the basic law that racial discrimination could not be practiced in the conduct of elections. The decisions in the Elmore case were against the "private club" theory.

The action of the Democratic State Convention in May 1948 was therefore somewhat of a surprise to all who had any knowledge of the matter. The convention frankly set up two standards of qualifications for voting; one applicable to the members of the white race, and the other to Negroes. This of course was in direct contradiction of all law and custom, which must or should have been well known to any students or even casual inquirers in regard to such matters. Such a flagrant disregard of basic rights must have sprung from either gross ignorance or a conscious

determination to evade the issue and to refuse to obey the law of the land. It is hardly credible that a convention composed of a large number of persons, many of whom have had long years of experience and were experts in political matters and a number of whom had actually taken part in the presentation and hearings of the Elmore case as attorneys or witnesses, should have been so crassly ignorant. It would therefore seem that the action of the convention was a deliberate attempt to evade the apparent consequence of the Elmore case. This belief is further supported by the fact that no apparent attention was paid to the opinion that was filed in the Elmore case and only the bald language of the order was followed. The order in that case was based entirely upon the prayer of the complaint but the opinion discussed the whole matter of voting in primaries in this State, together with all of its implications, and this court said (72 F.Supp. at page 528):

"The plaintiff and others similarly situated are entitled to *be enrolled* and to vote in the primaries conducted by the Democratic Party of South Carolina." (Emphasis added)

■ Of course it is true that that case applied only to the officials of Richland County, South Carolina, but the law was clearly and succinctly stated, and anyone who can read the English language must have known what it meant. So it is apparent that the rules above quoted (Rules 6 and 7), which provide for a double standard for the enrollment and voting of whites and Negroes, is a clear and flagrant evasion of the law as enunciated not only by this court but approved by the Circuit Court of Appeals for the Fourth Circuit and by the Supreme Court of the United States.

■ And the oath which was adopted by the convention (Rule 36) is another attempt to evade the American principle of allowing all persons to freely exercise the suffrage. To require, as a prerequisite to voting, that qualified electors take an oath subscribing to the views of the State Convention and/or its Executive Committee, is a flagrant disregard of the rights of American citizens to exercise their own views and opinions in the choice of representatives in their national government.

■ Neither in South Carolina nor in any other State in this union have American citizens as yet come to a pass where a group of party officials, in violation of basic American rights, can prescribe oaths, methods and a code of thought for voters. To carry this to its logical conclusion, it is wondered why the State Convention did not require an oath that all parties enrolling or voting should elect them in perpetuity and with satisfactory emoluments. The one party system has reached its apex in this State where the right is claimed not only to segregate according to race, to prescribe different methods of gaining the right to vote, to forbid participation in the organization for government of the party, but to prescribe mental tests and set up a code of thought which, far from being a bill of rights, might rather be called a bill of persecutions.

It would be interesting to consider and discuss the mental process by which these decisions in the convention were arrived at, but that is a psychological rather than a legal problem. Our sole concern here is as to the legality of these actions of the convention and of the Executive Committee, since the latter seems to have arrogated to itself the right to amend, order, modify and construe the rules adopted by the convention, irrespective of the prohibition against such a power. See Rules 49 and 51.

■ And now to summarize the case. The decisions of this court, approved by the higher courts, have clearly laid down the principle that the Democratic Party of South Carolina is performing a public function and conducts the true and realistic election wherein are chosen federal officials. This organization is not a private party or club and is subject to the laws of the United States and is not entitled to and is in fact prohibited from making any discrimination on account of race, color or creed in allowing enrollment, membership and full participation in its organization and in the election, whether called primary or by any other name, which it conducts

for the choice of presidential electors and federal officials.

It is important that once and for all, the members of this Party be made to understand—and that is the purpose of this opinion—that they will be required to obey and carry out the orders of this court, not only in the technical respects but in the true spirit and meaning of the same. This court is convinced that they are fully aware of what is the law, and it will not excuse further evasions, subterfuges or attempts to get around the same. It is time that either the present officials of the Party, or such as may be in the future chosen, realize that the people of the United States expect them to follow the American way of elections. It is believed that the great body of people in this State, as well as in this Nation, truly believe in the American ideals and methods, and it is hoped that the actions of the Party officials do not represent the true view of the people of South Carolina. But irrespective of whether that be true or not, it becomes the duty of this court to say to the Party officials that they will have to obey the true intent of the law, which is so clear and apparent that even they must know what it is, and that no excuse or evasion in the future will be tolerated.

■ An Order providing for a Temporary Injunction will be issued. This Order will provide that the books of enrollment for the Democratic Party Primary in the various counties in this State (save only Richland, Greenville, Pickens and Laurens Counties, the County officials of which have not been made parties or have been discharged from this cause) be forthwith opened for the enrollment of all persons who may be entitled to become electors and to exercise the right of suffrage under the Constitution and laws of the State of South Carolina irrespective of race, color or creed, and the defendants in this cause (save only those who have been dismissed herefrom) will be enjoined and restrained from debarring any such persons from putting their names upon the books in the respective County organizations, and enrolling, and taking part in such organizations by reason of their being whites or Negroes or by reason of any racial or religious difference whatsoever; and from voting and freely exercising their right to vote in any election or primaries by whatever name called, wherein persons vote and chose presidential electors and/or United States Senators and/or United States Congressmen.

And they and all of them will be further restrained and enjoined from requiring any person seeking to enroll, to join or become members of the organizations above referred to, or to vote in the elections or primaries, to take the test oath, either in its original form or as amended, as set out in Rule 36 of the Rules of the Democratic Party of South Carolina, or any modification or other test oath requiring a declaration of principles, understandings, or beliefs, whereby the voters are required to adopt the views, desires, or principles laid down by the authors of such oath which may be in conflict with the rights of persons to exercise their privilege of suffrage in accord with the law and spirit of the American Republic.

It is the intent of this opinion that the full spirit hereof, as well as the mere letter, be obeyed so that the Democratic organization of South Carolina and the primaries which it holds shall be freely open to all parties entitled to enter therein under the laws and Constitution of this country and State, without discrimination of race, color or creed. And any violation of the terms of the Order, or of the law as set forth in this opinion, by them or their successors in office, or those acting under them, will be considered a contempt and will be proceeded against and punished.

Findings of fact, conclusions of law and an order are being filed.