Michael N. CANLIS, Sheriff-Coroner, County of San Joaquin; et al., Plaintiffs-Appellants,

v.

SAN JOAQUIN SHERIFF'S POSSE COMITATUS; Francis Gillings; Norman Brown; George Hill; Steven Gillings; Ernest Perry; Michael Eugene Brown; Lewis Daniel Elam; Frank Ray; Rufus Shackleford; Western Tomato Growers and Shippers, Inc.; Stockton Tomato Company, Inc.; and Southern Pacific Company, Defendants-Appellees.

No. 78-3134.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 11, 1980.

Decided April 6, 1981.

Rehearing and Rehearing En Banc Denied May 28, 1981.

Gary M. Messing, Carroll, Burdick & McDonough, San Francisco, Cal., for plaintiffs-appellants.

George J. Tichy, II, San Francisco, Cal., for defendants-appellees; J. Michael Phelps, Littler, Mendelson, Fastiff & Tichy, P.C., San Francisco, Cal., Suzanne Trimble, Memering & DeMers, Sacramento, Cal., on brief.

Before WRIGHT and TANG, Circuit Judges, and GRANT *, Senior District Judge.

GRANT, Senior District Judge:

This is an appeal from an Order of the United States District Court for the Eastern District of California dismissing a civil rights action brought pursuant to 42 U.S.C. §§ 1983, 1985.[1] The question before this court is whether the district court erred in dismissing the complaint for failure to state a claim upon which relief could be granted.[2]

Appellants' complaint, filed August 30, 1976, is founded upon various incidents which occurred during the late summer and early fall of 1975 when the United Farm Workers of America (UFW) were seeking to organize farm workers in the County of San Joaquin, California. The named individual appellant-plaintiffs are members of varying rank of the San Joaquin County Sheriff's Office. Appellant San Joaquin

---

* Senior District Judge Robert A. Grant of the United States District Court for the Northern District of Indiana, is sitting by designation.

1. Along with their federal law claims, appellants asserted several claims based upon the laws of the State of California through the pendent jurisdiction powers of the court.

2. The district court dismissed the action pursuant to appellee Perry's motion for dismissal under Fed.R.Civ.P. 12(b)(1) and (6), appellees' (Rufus Shackleford, Western Tomato Growers and Shippers, Inc., Michael Eugene Brown, Frank Ray, and Stockton Tomato Co., Inc.) motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) (or in the alternative for summary judgment pursuant to Fed.R.Civ.P. 56 or dismissal under Fed.R.Civ.P. 12(b)(6), and appellants' motion for sanctions against the remaining appellees. Although the district court failed to specifically articulate upon which ground it was basing its decision, it appears that the complaint was dismissed as a judgment on the pleadings and will be treated as such by this court.

Defendant Southern Pacific Company was dismissed on November 9, 1976, pursuant to a stipulation for dismissal under Fed.R.Civ.P. 41(a)(1) and is not a party to this appeal.

Sheriff's Benefit Association, an employee organization which is the recognized employee organization for employees of the San Joaquin County Sheriff's Office, brings this action on behalf of itself and its members. The named individual appellee-defendants are members of appellee-defendant "San Joaquin Sheriff's Posse Comitatus," an unincorporated association of private citizens, which is a local chapter of a nationwide organization titled "Posse Comitatus" which operates in many California counties. The named corporate appellee-defendants are all entities incorporated under the laws of the State of California with their principal place of business in San Joaquin County.

### Background

The material allegations of the complaint, taken as true and liberally construed in the light most favorable to the appellants, *Ernest W. Hahm, Inc. v. Codding*, 615 F.2d 830, 834 (9th Cir. 1980); *Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.*, 583 F.2d 426, 430 (9th Cir. 1978); *Sherman v. Yakahi*, 549 F.2d 1287, 1290 (9th Cir. 1977), present the following facts:

### A. Events Preceding the Confrontation of September 2, 1975

On August 30, 1975, several members of the United Farm Workers of America sought entrance to a field owned and operated by the Lathrop Farm Labor Center in the County of San Joaquin. Their purpose was to solicit authorization cards from the employees to determine their possible allegiance to the UFW in the event of a union election. The UFW representatives were advised by Ernest Perry and Leonard Loduco, co-owners of the Center, that the field was their property and that the UFW rep-

resentatives were trespassing and would be forcibly removed if necessary. During this confrontation, Loduco reported the incident by telephone to the San Joaquin County Sheriff's Office. Several deputy sheriffs responded to the call. A "shouting match" then ensued between one of the UFW representatives and Perry, with one of the representatives being pushed to the ground. Shortly thereafter, additional sheriff deputies arrived at the scene and witnessed Perry and a UFW representative attempting to place each other under citizen's arrest. The deputies separated the two men and after speaking with both parties, asked the UFW members to leave the property.[3]

One day later on August 31, 1975, Perry contacted deputy LaFave and told him that he and other growers and farm owners in the San Joaquin County area were "expecting trouble" from UFW representatives. He also told LaFave that armed and prepared members of Posse Comitatus would be present in the fields to insure that any UFW representatives would be prevented from entering and, further, that the Posse Comitatus members would arrest any sheriff deputies who failed to carry out their constitutional duties. Perry later went to the residence of District Attorney Joseph Baker and stated that he had just joined the Posse Comitatus, and that its members would arrest sheriff deputies who failed to perform their duties in a manner acceptable to the Posse Comitatus.

On the morning of September 1, 1975, deputy McGaughey was contacted by Herman Garza, a UFW organizer. Garza stated that a member of the Posse Comitatus threatened to shoot Garza or any other UFW representative who set foot on the property he was protecting.[4] James Drake, another UFW representative, informed

---

**3.** On September 1, 1975, Perry filed criminal complaints with the Sheriff's Office against the UFW representatives as a result of the August 30 incident. He was informed by appellants Rodney Brown and Robert Fouts that such complaints would necessarily have to be approved by the District Attorney. Perry protested this procedure and stated, "we'll get your jobs," or words to that effect. District Attor-

ney Joseph Baker ultimately refused to issue any criminal complaint.

**4.** The particular field contained a crop of tomatoes which was grown by appellee Stockton Tomato Company; bought and harvested by appellee Western Tomato Growers and Shippers Company; with the field itself owned by Southern Pacific Company.

McGaughey that Francis Gillings had made a similar threat to him. Gillings later confirmed to McGaughey that he had in fact made the threat.

During the evening of September 1, 1975, a meeting was held at the Lathrop Farm Labor Center. Those in attendance included property owners, tomato growers and members of the Posse Comitatus.[5] Discussions focused upon the expected visit from UFW representatives the following morning on their property in another attempt to organize the farm workers. In response, the Posse Comitatus was authorized to act on behalf of the owners and growers in the defense of their respective properties. The owners and growers additionally advised the Posse Comitatus that no one, including police officers, were to be permitted to enter their respective properties, and that any who attempted to do so were to be prevented by any means necessary. All those present expressly agreed that the Posse Comitatus would protect the properties beginning the next day.

### B. The Confrontation of September 2, 1975

At daybreak the next morning, ten to fifteen sheriff deputies were patrolling various properties in the San Joaquin area. The Sheriff's Office had been forewarned about potential labor disputes and possible violence that might erupt between UFW representatives and various property owners, growers, and members of the Posse Comitatus. At the same time, approximately fifteen members of the Posse Comitatus were patrolling the borders of one of the fields. All appeared to be armed with guns and clubs. All were wearing badges on their shirts bearing the legend "Sheriff's Posse Comitatus" which were substantially identical in design and appearance to the official badges issued to deputies of the San Joaquin County Sheriff's Office. Upon arrival of the UFW representatives, a confrontation soon ensued.[6] The UFW representatives stated to both the members of the Posse Comitatus and the sheriff deputies that they had a legal right of access to the field pursuant to an order by the California Agricultural Relations Board, dated September 29, 1975, allowing access for union organizing.

At approximately 7:15 a. m., Deputy District Attorney Joseph DaSilva arrived at the field at the request of the Sheriff's Office to render a legal opinion concerning the access order. DaSilva concluded that the UFW representatives had a legal right to enter but recommended that if they were refused entrance by the Posse Comitatus, the deputies should not escort them into the field by force. DaSilva advised the UFW representatives and the deputies that arrests should only be made in the event of any criminal violations. DaSilva further advised that if the Posse Comitatus continued in the denial of access to the UFW representatives, the remedy would be to have the representatives seek judicial enforcement of the order of the Agricultural Relations Board. The representatives of the UFW were then asked to leave the area

---

5. Appellees Perry, Michael Eugene Brown, Rufus Shackleford, Frank Ray, Francis Gillings and George Hill were some of those present. At this meeting, Perry acted on behalf of the Lathrop Farm Labor Center, Ray acted on behalf of the Stockton Tomato Company, and Shackleford and Brown acted on behalf of the Western Tomato Growers and Shippers Company. All were sworn in as members of the Posse Comitatus at the meeting.

6. Prior to this confrontation, appellant Ken Wagner observed Michael Eugene Brown put up a sign at the edge of the field, signed "Western Tomato Growers, by Gene Brown," which stated in pertinent part:
"NOTICE

KEEP OFF—NO TRESPASSING
TO ALL OFFICERS OF THE LAW
INCLUDING ALL FEDERAL, STATE,
COUNTY OR CITY AGENTS

Any officer, or other person at the direction of any officer, whether an undercover agent or not, who attempts to enter these premises without a proper warrant or judgment issued out of a court which is a part of the judicial branch of the government, and issued under the seal of the court, signed by the clerk, will be treated as any other trespasser or lawless intruder would be when attempting to break and enter an inhabited dwelling when warned not to do so. Survivors will be prosecuted."

of the road leading up to the field. They complied with the request. During this tense confrontation, no violence erupted despite frequent "shouting matches" between the UFW representatives who were positioned outside the gates to the field and the Posse Comitatus members who were positioned inside the gates to the field and defending it.

Shortly after the departure of the UFW members, Francis Gillings arrived, entered the field, and immediately took charge of the Posse Comitatus members. Information from a record check conducted by the Sheriff's Office upon Gillings[7] revealed that the City of Tracy, located within San Joaquin County, was holding a warrant for Gillings' arrest for his failure to appear at a hearing relating to a speeding ticket.

At approximately 9:00 a. m., Inspector Daniel Delfatti of the Sheriff's Office decided to arrest Gillings pursuant to that outstanding warrant. He was accompanied by three fellow deputies, with four others serving as backup, to observe the approximately forty members of the Posse Comitatus who at this time were spread throughout the field and to insure that none of them would attempt to interfere with the arrest. Delfatti led the arrest team to the edge of the field and called out to Gillings that he had a warrant for his arrest. As the arrest team drew closer, they were confronted by Posse member George Hill who threatened to shoot the officers if they proceeded any further. Hill began to push and shove Delfatti. Despite being warned that he was unlawfully interfering with the arrest duties of a police officer, Hill continued. Delfatti again called out to Gillings that he had a warrant for Gillings' arrest.

Gillings responded by racking the loading mechanism of his shotgun and backing away from Delfatti and the arrest team. The arrest team, already in the field, continued walking towards him. While retreating, Gillings shouted to his armed comrades of the Posse Comitatus, "Back me up! Back me up!" Delfatti approached Gillings and informed him that he was under arrest. Gillings raised his loaded shotgun and pointed it directly at Delfatti. Delfatti instantly leaned down to his left so as to avoid the muzzle of the shotgun and to possibly grab and remove it from Gillings' possession. As he leaned down, Gillings discharged the gun with the shot narrowly passing Delfatti's ear. Delfatti was then able to wrestle the shotgun away assisted by two deputies who physically subdued Gillings and arrested him.

At some point between the discharge of the shotgun and the physical arrest of Gillings, his son Stephen pointed an automatic shotgun at deputies LaFave and Rodriquez and attempted to fire at them. The gun jammed and did not fire. Rodriquez drew his revolver and ordered the younger Gillings to drop the shotgun. He did and was taken into custody.

At the same moment that Francis Gillings discharged his shotgun, Norman Brown drew a shotgun and pointed it at deputy Gerald Krien. Krien repeatedly ordered Brown to drop the shotgun, but Brown refused to do so. After two other officers ordered Brown to drop the gun, he finally did so and was arrested. Francis Gillings, George Hill and Norman Brown were all convicted for various offenses arising out of these events.[8]

---

7. During this entire period, in light of the fact that all of the members of the Posse Comitatus at the scene appeared to be armed, the Sheriff's Office was conducting record checks to determine whether any outstanding arrest warrants existed for members of the Posse Comitatus or the UFW who could be recognized.

8. The District Attorney for the County of San Joaquin charged Francis Gillings with three criminal counts: Cal.Penal Code § 245(b) (Assault with a deadly weapon upon a peace officer [Inspector Daniel Delfatti]); Cal.Penal Code

§ 245(b) (Assault with a deadly weapon upon a peace officer [Deputy John LaFave]); and Cal. Penal Code § 272 (Contributing to the delinquency of a minor). Following a jury trial, Gillings was convicted on August 9, 1976, of violating Cal.Penal Code § 245(a) (Assault with a deadly weapon) and Cal.Penal Code § 272.

The District Attorney charged George Hill with a criminal violation of Cal.Penal Code § 148 (Resisting, delaying, or obstructing an officer in the discharge of his duties). Hill was

*The 42 U.S.C. § 1983 Claim*

A fundamental requirement of § 1983 [9] is that the challenged action must have been taken "under color of state law." *See Life Insurance Company of North America v. Reichardt,* 591 F.2d 499, 501 (9th Cir. 1979); *Briley v. State of California,* 564 F.2d 849, 853 (9th Cir. 1977); *Williams v. Gorton,* 529 F.2d 668, 670 (9th Cir. 1976), *aff'd,* 566 F.2d 1186 (9th Cir. 1977); *Ouzts v. Maryland National Insurance Co.,* 505 F.2d 547, 550 (9th Cir. 1974), *cert. denied,* 421 U.S. 949, 95 S.Ct. 1681, 44 L.Ed.2d 103 (1975); *Sykes v. State of California, (Department of Motor Vehicles),* 497 F.2d 197, 200 (9th Cir. 1974); *Cohen v. Norris,* 300 F.2d 24, 30 (9th Cir. 1962). The district court dismissed appellants' cause of action under § 1983 for failing to set forth sufficient facts to establish state action. We agree with this finding.

Appellants rely upon two separate theories in support of their claim that the appellees were acting under color of state law. First, that the "San Joaquin Sheriff's Posse Comitatus" filed a Charter with the County Recorder's Office of San Joaquin County on February 18, 1975. Second, that there existed a "custom" within the San Joaquin County area that clothed the Posse Comitatus with the authority of the state. [10]

■ In *Life Insurance Company of North America v. Reichardt,* 591 F.2d 499, 501–02 (9th Cir. 1979), this court comprehensively summarized the wide range of criteria to be applied in determining whether there has been sufficient state action or involvement to give rise to a claim under § 1983. Appellants' reliance upon the filing of the Charter by the Posse Comitatus unquestionably fails to satisfy those criteria. As Judge Wright stated in *Reichardt :*

Mere state action is insufficient to support a § 1983 cause of action. There must be a sufficient nexus between the state action and the private discrimination.

591 F.2d at 502.

The mere filing of a Charter as alleged in appellants' complaint, without more, does not constitute a "sufficient nexus." [11]

■ Appellants' reliance upon a "custom" sufficient to create the requisite level of state involvement is completely without merit. This court acknowledges appellants' basic premise that certain practices by state officials could be violative of § 1983

---

convicted on April 30, 1976, in the San Joaquin County Municipal Court.

The District Attorney charged Norman Brown with a criminal violation of Cal.Penal Code § 245(b) (Assault with a deadly weapon upon a peace officer [Gerald Krien]). Brown was found guilty of violating Penal Code § 240 (Assault).

**9.** 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**10.** Appellants also argue that the state action requirement under § 1983 is outmoded. Such argument has absolutely no basis and is summarily rejected.

**11.** *See Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Yiamouyiannis v. Chemical Abstracts Service,*

578 F.2d 164, 166 (6th Cir.), *cert. denied,* 439 U.S. 983, 99 S.Ct. 573, 58 L.Ed.2d 654 (1978); *Cohen v. Illinois Institute of Technology,* 524 F.2d 818, 824 (7th Cir.), *cert. denied,* 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976); *Greenya v. George Washington University,* 512 F.2d 556, 559–60 (D.C.Cir.), *cert. denied,* 423 U.S. 995, 96 S.Ct. 422, 46 L.Ed.2d 369 (1975); *Blackburn v. Fisk University,* 443 F.2d 121, 123 (6th Cir. 1971); *Kadlec v. Illinois Bell Telephone Co.,* 407 F.2d 624, 626 (7th Cir.), *cert. denied,* 396 U.S. 846, 90 S.Ct. 90, 24 L.Ed.2d 95 (1969); *Rosee v. Board of Trade of City of Chicago,* 311 F.2d 524, 525 (7th Cir.), *cert. denied,* 374 U.S. 806, 83 S.Ct. 1693, 10 L.Ed.2d 1031 (1963); *Ludwig v. Quebecor Dailies, Inc.,* 475 F.Supp. 57, 58 (E.D.Pa.1979); *Jordan v. Hawaii Government Employees' Association, Local 152,* 472 F.Supp. 1123, 1130 (D.Hawaii 1979); *Sament v. Hahnemann Medical College and Hospital of Philadelphia,* 413 F.Supp. 434, 439 (E.D.Pa.1976), *aff'd,* 547 F.2d 1164 (3d Cir. 1977); *Stearns v. Veterans of Foreign Wars,* 394 F.Supp. 138, 143–44 (D.D.C.1975), *aff'd,* 527 F.2d 1387 (D.C.Cir.), *cert. denied,* 429 U.S. 822, 97 S.Ct. 72, 50 L.Ed.2d 83 (1976).

"[a]lthough not authorized by written law [where such practices] could well be so permanent and well settled as to constitute 'custom or usage' with the force of law." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970). Appellants fail, however, to set forth in their complaint any allegations that establish a "custom" between the state and the Posse Comitatus. The unilateral and unauthorized adoption of "San Joaquin Sheriff's" as a modifying phrase to the organization's basic title of "Posse Comitatus" and the wearing of badges substantially identical in design and appearance to the badges worn by deputies of the Sheriff's Office do not constitute state action or involvement. If the Posse Comitatus had aided or assisted local or state law enforcement officials in the past, or if there existed a California statute or county ordinance which expressly empowered a deputy sheriff with the authority to call out a posse comitatus in times of emergency,[12] appellants' argument might possess merit. But such is not the case here. The source of authority for the actions of the Posse Comitatus lies in the organization itself, not from any express or implied state delegation. The state has never jointly participated with the Posse Comitatus in any action nor have mutual benefits been conferred between them. The impetus for all conduct by the Posse Comitatus was purely private, solely and exclusively from within the organization itself. The complaint fails to set forth a single fact to the contrary. Furthermore, rather than acting under the color of state law, the Posse was opposed by the state. Therefore, appellants' reliance upon a "custom" sufficient to satisfy the requisite level of state involvement must be rejected.

For these reasons, the district court's dismissal of appellants' action under § 1983 is affirmed.

### The 42 U.S.C. § 1985(1) Claim

Section 1985(1) provides as follows:

If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means *any officer of the United States* to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties;

(emphasis added).

█ The clear import of this language is that the statute's protections extend exclusively to the benefit of federal officers. There is nothing in the language of the statute nor in the legislative history to support appellants' interpretation that § 1985(1) does not apply exclusively to federal officers. Appellants contend that *Stern v. United States Gypsum, Inc.*, 547 F.2d 1329 (7th Cir.), *cert. denied*, 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977), supports their interpretation. This reliance is misplaced. In *Stern*, the court expanded the scope of § 1985(1) to not only protect federal officers who are injured while attempting to enforce the provisions of the Fourteenth Amendment, but to also protect federal officers who are injured in the course of their normal federal duties unrelated to the Fourteenth Amendment. The court did not expand the scope of the statute to include non-federal officers. The plaintiff in *Stern* was an agent for the Internal Revenue Service, and Judge Pell's careful review of the legislative history un-

---

**12.** In *Scott v. Vandiver*, 476 F.2d 238 (4th Cir. 1973), a South Carolina statute empowered a deputy sheriff to call out a posse comitatus to assist in arresting suspected violators of the law. In addition, the Sheriff had in the past exercised common law powers to summon by-

standers in manhunts with the force of law. The court there concluded that the appointment of temporary state law enforcement officials subjected them to liability under § 1983. Those conditions are quite opposite to those in the instant case.

deniably confirms this court's holding that non-federal officers are not the intended beneficiaries of the rights and protections afforded by § 1985(1).

The conclusion of this court is identical to that reached by the court in *Baron v. Carson*, 410 F.Supp. 299 (N.D.Ill.1976). In that case, the court found that a member of the County Board of Health was not a protected officer within the meaning of § 1985(1). The court stated:

> On its face, § 1985(1) relates solely to federal officers and federal office holders. The dearth of reported case law on this specific issue appears to be no more than a reflection on the clarity of the statutory language, and the inapplicability of § 1985(1) to anyone but federal officers. Those few courts which have dealt specifically with the question of proper plaintiffs under subsection (1) have done so in passing, noting only the obvious limitations of the statute's applicability. *See, e. g., Veres v. County of Monroe*, 364 F.Supp. 1327, 1329 (E.D. Mich.1973); *McIntosh v. Garofalo*, 367 F.Supp. 501, 505 n.4 (W.D.Pa.1973); *Carraway v. Jefferson Parish School Board*, 251 F.Supp. 462, 463 (E.D.La.1966).

The only case to which plaintiff points in support of his contention for coverage of state officials under § 1985(1) is *Grif-*

*fon v. Congress of Racial Equality*, 221 F.Supp. 899 (E.D.La.1963), which, as noted by defendants, has been repudiated on that issue by the Fifth Circuit in *Congress of Racial Equality v. Clemmons*, 323 F.2d 54, 63 (5th Cir. 1963).

We therefore hold that plaintiff's status as a county official is not protected within the meaning of § 1985(1) and accordingly dismiss Count I of the complaint for lack of subject matter jurisdiction.

410 F.Supp. at 301.[13]

Appellants are state law enforcement officers with the San Joaquin County Sheriff's Office. They are not federal officers as required by § 1985(1). Accordingly, the district court's dismissal of appellants' action under § 1985(1) is affirmed.

### *The 42 U.S.C. § 1985(3) Claim*

Section 1985(3)[14] provides a private civil remedy for persons injured by conspiracies to deprive them of their right to equal protection of the laws. The landmark case construing § 1985(3) is *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). In *Griffin*, a group of black citizens were assaulted by a group of white citizens as they traveled on an interstate highway in Mississippi. The assault was conducted under the mistaken belief that

---

**13.** Those courts which have specifically dealt with the question of proper plaintiffs since *Baron* have also done so in passing, which again confirms "the obvious limitation of the statute's applicability." *See Wagar v. Hasenkrug*, 486 F.Supp. 47, 50 (D.Mont.1980); *Hermes v. Hein*, 479 F.Supp. 820, 825 (N.D.Ill.1979); *Citizens League for Civil Rights, Inc. v. Baker*, 464 F.Supp. 1389, 1391 (W.D.Wis.1978); *Neely v. Blumenthal*, 458 F.Supp. 945, 951 (D.D.C.1978); *Kedra v. City of Philadelphia*, 454 F.Supp. 652, 662 (F.D.Pa.1978); *United States ex rel. Hoss v. Cuyler*, 452 F.Supp. 256, 279 (E.D.Pa.1978); *DesVergnes v. Seekonk Water District*, 448 F.Supp. 1256, 1260 (D.Mass.1978), *modified on other grounds*, 601 F.2d 9 (1st Cir. 1979); *Coggins v. McQueen*, 447 F.Supp. 960, 966 n.6 (E.D.Pa.1978); *Curran v. Portland Superintending School Committee*, 435 F.Supp. 1063, 1079 n.9 (D.Me.1977); *Martin Hodas, East Coast Cinematics, Inc. v. Lindsay*, 431 F.Supp. 637, 645 n.11 (S.D.N.Y.1977); *Brainerd v. Potratz*, 421 F.Supp. 836, 839 n.2 (N.D.Ill.1976), *aff'd*, 566 F.2d 1177 (7th Cir. 1977).

**14.** Section 1985(3) provides in pertinent part:

> If two or more persons . . . conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

*See Great American Federal Savings & Loan Association v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), and the cases cited therein for a comprehensive review of the legislative history of § 1985(3).

the plaintiffs were civil rights workers. The issue before the Supreme Court was whether the coverage of § 1985(3) reached individuals acting in a purely private capacity. In holding that it does, the Court enumerated the guidelines for measuring the sufficiency of a complaint under § 1985(3).

> To come within the legislation a complaint must allege that the defendants did (1) "conspire or go in disguise on the highway or on the premises of another" (2) "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." It must then assert that one or more of the conspirators (3) did, or cause to be done, "any act in furtherance of the object of [the] conspiracy," whereby another was (4a) "injured in his person or property" or (4b) "deprived of having and exercising any right or privilege of a citizen of the United States."

403 U.S. at 102–03, 91 S.Ct. at 1798.

Despite the unanimity in the decision, the broad facial sweep of the language in § 1985(3) caused considerable concern for the Court. The Court cautioned that although § 1985(3) was intended by Congress to reach private action, Congress did not intend for it to reach "all tortious, conspiratorial interferences with the rights of others." 403 U.S. at 101, 91 S.Ct. at 1798. To effectuate this congressional intention, the Court further defined the second element set forth above to require "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.* at 102, 91 S.Ct. at 1798 (footnote omitted). Given the facts of the case before it, however, the Court expressly refrained from deciding whether a conspiracy motivated by invidiously discriminatory animus other than racial bias would be actionable under § 1985(3). *Id.* at 102 n.9, 91 S.Ct. at 1798.

In the years following *Griffin*, courts have disagreed concerning which conspiracies motivated by non-racial invidiously discriminatory animus fall within the ambit of § 1985(3) protection.[15] Although § 1985(3) was originally designed to protect oppressed

---

**15.** No post-*Griffin* court has found that § 1985(3) is limited exclusively to racial situations. Many federal courts have unhesitatingly expanded the protections of § 1985(3) well beyond the racial context. *See Weise v. Syracuse University*, 522 F.2d 397 (2d Cir. 1975) (female faculty members); *Means v. Wilson*, 522 F.2d 833 (8th Cir. 1975), *cert. denied*, 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976) (Indian supporters of a political candidate); *Glasson v. City of Louisville*, 518 F.2d 899 (6th Cir.), *cert. denied*, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975) (supporters of a political candidate); *Marlowe v. Fisher Body*, 489 F.2d 1057 (6th Cir. 1973) (employees of Jewish faith); *Smith v. Cherry*, 489 F.2d 1098 (7th Cir. 1973), *cert. denied*, 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974) (voters who were deceived as to the actual effect of their vote); *Cameron v. Brock*, 473 F.2d 608 (6th Cir. 1973) (supporters of a political candidate); *Azar v. Conley*, 456 F.2d 1382 (6th Cir. 1972) (middle class white family); *Action v. Gannon*, 450 F.2d 1227 (8th Cir. 1971) (members of a predominantly white Catholic parish); *Harrison v. Brooks*, 446 F.2d 404 (1st Cir. 1971) (married couple); *Richardson v. Miller*, 446 F.2d 1247 (3d Cir. 1971) (persons who advocated racial equality in employment opportunities); *Thompson v. State of New York*, 487 F.Supp. 212 (N.D.N.Y.1979) (In-

dians, relatives of Indians, or residents of Indian reservations); *Lapin v. Taylor*, 475 F.Supp. 446 (D.Hawaii 1979) (federal employees who disclose illegal or improper government activities); *Curran v. Portland Superintending School Committee*, 435 F.Supp. 1063 (D.Me. 1977) (female employees); *Local No. 1 (ACA) v. International Brotherhood of Teamsters*, 419 F.Supp. 263 (E.D.Pa.1976), *aff'd in part, rev'd in part*, 614 F.2d 846 (3d Cir. 1980) (class expressing views contrary to union leadership); *Milner v. National School of Health Technology*, 409 F.Supp. 1389 (E.D.Pa.1976) (female employees); *Bradley v. Clegg*, 403 F.Supp. 830 (E.D.Wis.1975) (class of striking and picketing teachers); *Brown v. Villanova University*, 378 F.Supp. 342 (E.D.Pa.1974) (class of students exercising First Amendment rights through membership in certain organizations); *Pendrell v. Chatham College*, 370 F.Supp. 494 (W.D.Pa. 1974) (female faculty members); *Stern v. Massachusetts Indemnity & Life Insurance Co.*, 365 F.Supp. 433 (E.D.Pa.1973) (female insurance purchasers).

Other courts have not demonstrated the same willingness to expand the protections of § 1985(3). *See Carchman v. Korman Corp.*, 594 F.2d 354 (3d Cir.), *cert. denied*, 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979) (tenant organizers); *Lessman v. McCormick*, 591

southern blacks from the violence of the vindictive Ku Klux Klan, it is reasonably clear that the drafters intended to extend the protections under § 1985(3) to other groups as well. In *Life Insurance Company of North America v. Reichardt, supra*, 591 F.2d at 505, this court held that female plaintiffs alleging a conspiracy to deprive a class of women purchasers of disability insurance of their equal rights constitute a protected class.

Even though § 1985(3) has been expanded beyond its narrow historical perspectives, the boundary is not unlimited. A short time after *Reichardt*, an attempt to further expand the reach of § 1985(3) was rejected by this court. In *DeSantis v. Pacific Telephone & Telegraph Co., Inc.*, 608 F.2d 327 (9th Cir. 1979), three male and two female employees filed actions under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1985(3), alleging unlawful discrimination because of their homosexuality. The district court dismissed the complaints as failing to state claims under either statute. On appeal, plaintiffs claimed that after *Reichardt*, homosexuals could claim the protection of § 1985(3). This court rejected the argument, emphasizing that neither Congress nor the federal courts had at any time since 1871 deemed the rights of homosexuals to require special protection. 608 F.2d at 333.

The *DeSantis* court acknowledged that "§ 1985(3) has been liberated from the now anachronistic historical circumstances of reconstruction America," *id.*, but emphasized that the antidiscrimination principle underlying § 1985(3) applies only to groups that require and warrant special federal assistance in protecting their civil rights. *See id.*

■ The appellants have failed to demonstrate that they are members of a class entitled to § 1985(3) protection. They have not shown that San Joaquin County Sheriff's officers constitute such a class. We find, as did the court in *Taylor v. Nichols*, 409 F.Supp. 927 (D.Kan.1976), *aff'd*, 558 F.2d 561 (10th Cir. 1977), "that in the context of the instant case anti-police bias does not constitute the kind of 'class-based invidiously discriminatory animus' envisioned and prohibited by § 1985." 409 F.Supp. at 936.

■ The appellants also assert that they were the victims of class-based discrimination against the United Farm Workers. We need not determine whether classes comprising members of labor organizations are protected by § 1985(3), for the appellants are not members of the United Farm

F.2d 605 (10th Cir. 1979) (debtors); *Bova v. Pipefitters & Plumbers Local 60, AFL–CIO*, 554 F.2d 226 (5th Cir. 1977) (non-union employee); *McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919 (5th Cir. 1977) (en banc) (bankrupts); *Cohen v. Illinois Institute of Technology*, 524 F.2d 818 (7th Cir.), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976) (sex based discrimination); *Bellamy v. Mason's Stores, Inc.*, 508 F.2d 504 (4th Cir. 1974) (employees discharged because of Ku Klux Klan membership); *Baker v. Stuart Broadcasting Co.*, 505 F.2d 181 (8th Cir. 1974) (declining to pass on district court's holding that § 1985(3) does not reach sex based conspiracies); *Bricker v. Crane*, 468 F.2d 1228 (1st Cir. 1972), *cert. denied*, 410 U.S. 930, 93 S.Ct. 1368, 35 L.Ed.2d 592 (1973) (doctors discriminated against because they have testified adversely to their brethren in malpractice cases); *Fallis v. Toastmasters International, Inc.*, 467 F.2d 1389 (5th Cir. 1972) (federal prison employees and inmates); *Jacobson v. Industrial Foundation of the Permian Basin*, 456 F.2d 258 (5th Cir. 1972) (employees on blacklist because they have filed workmen's compensation claims); *Johnson v. City of Cincinnati*, 450 F.2d 796 (6th Cir. 1971) (sex based discrimination); *Highfield Water Co. v. Public Service Commission*, 488 F.Supp. 1176 (D.Md.1980) (privately owned utility companies and their shareholders); *Wagar v. Hasenkrug*, 486 F.Supp. 47 (D.Mont.1980) (public drunks); *Abbott v. Moore Business Forms, Inc.*, 439 F.Supp. 643 (D.N.H.1977) (age group); *Cartolano v. Tyrrell*, 421 F.Supp. 526 (N.D.Ill. 1976) (manufacturers and displayers of fireworks); *Western Telecasters, Inc. v. California Federation of Labor, AFL–CIO*, 415 F.Supp. 30 (S.D.Cal.1976) (employees of a non-union entity); *Smith v. Armstrong*, 396 F.Supp. 753 (N.D. Tex.), *aff'd without opinion*, 524 F.2d 1231 (5th Cir. 1975) (families who have been disrupted by a particular religious cult); *Knott v. Missouri Pacific Railroad Co.*, 389 F.Supp. 856 (E.D. Mo.), *aff'd*, 527 F.2d 1249 (8th Cir. 1975) (female employees, claims under § 1985(3) not appealed); *Furumoto v. Lyman*, 362 F.Supp. 1267 (N.D.Cal.1973) (non-white opponents of racism).

Workers. The law of this circuit is clear: the plaintiff must be a member of the class discriminated against to claim the benefits of § 1985(3). *Briley v. California*, 564 F.2d 849, 859 (9th Cir. 1977); *Lopez v. Arrowhead Ranches*, 523 F.2d 924, 927 (9th Cir. 1975).

Because neither asserted basis for class discrimination satisfies § 1985(3), we affirm the dismissal of the § 1985(3) action.

Dismissal of the pendent state law claims is also affirmed. The district court properly exercised its discretion to dismiss the claims in light of the weakness of the federal claims.

AFFIRMED.